EDWARD S. CAMPBELL, receiver of the Middlesex County Bank,

*v.*

URIAH BURDGE WATSON, JAMES LAWRENCE KEARNY, EDWARD R. PIERCE, PATRICK CONVERY, ROBERT N. VALENTINE, JAMES T. WATSON and JOHN G. WILSON.

[Submitted September 14th, 1901. Decided October 8th, 1901.
Filed December 21st, 1901.]

1. An action by a bank receiver against directors, for losses alleged to have been caused by their negligence, is not premature because the total losses have not been ascertained and the exact limit of the directors' liability fixed.

2. A bank's creditors, on its insolvency, have a direct interest in its affairs, and are the *cestuis que trustent* of the receiver, entitled to enforce all the corporation's rights, and to collect its assets, including the right to claim damages for the directors' negligence.

3. The relation between the ordinary depositor of cash and a bank of deposit, being that of debtor and creditor, and not one of bailment, it cannot be claimed, in a suit by the bank's receiver against the directors for losses caused by their alleged negligence, that the bank was a mere gratuitous bailee, and only bound to use the lowest degree of diligence in the care of the deposits.

4. An insolvent bank's charter directed that its affairs be managed by directors, who should make quarterly statements of the bank's actual condition, and the by-laws required them to examine the bank every three months. The insolvent bank had a correspondent bank, from which the

Campbell, Receiver, *v.* Watson.

former's cashier abstracted large sums by drawing checks and entering them on the insolvent's books for less amounts, by drafts which were never credited, and by overcharges and false charges against the correspondent bank. Such peculations continued for several years without detection. The directors trusted the correctness of the correspondent's accounts entirely to the cashier, and no inquiry was made as to any possible discrepancy. An examination and comparison of the accounts with the correspondent would have revealed the defalcations.—*Held*, sufficient to show that the perpetration of such frauds was the consequence of the directors' neglect, rendering them liable in an action by the bank's receiver.

5. Where a bank's charter is renewed by direction that the period of its existence shall be extended as fully as if the extended period had been named in the original charter, the directors, in a suit by its receiver against them, cannot claim that a by-law adopted previous to the extension, and relied on by the receiver, was not binding because of the expiration of the original charter.

6. In a suit by a bank's receiver against its directors for losses occasioned by alleged neglect of duty, the fact that a by-law relied on by the receiver, failure to comply with which probably led to the loss, had been disregarded for so long a time that its repeal might be presumed, cannot avail the defendants as a defence.

7. Where a bank's by-laws require its directors to appoint a committee every three months for an examination of the bank's condition, the fact that examinations were occasionally made by the state examiner cannot relieve the directors from loss occasioned by their failure to comply with such requirement.

8. The directors of a bank are not excusable for losses occasioned the bank by their failure to comply with its by-laws because ignorant of their existence.

9. In an action by a bank's receiver against the directors for losses caused by the cashier's abstractions during several years, which it was alleged they negligently failed to sooner discover, defendants cannot claim that to hold them responsible for failure to discover such defalcations would require of them too high a degree of care and attention, where the examination necessary to discover the frauds required merely an adjustment of accounts.

10. The directors of an insolvent bank are liable for losses occasioned by loans made to its cashier on insufficient security to make good his overdrawn accounts, where the overdrafts were continued after the bank examiner had directed their attention to such objectionable practice.

11. In an action by a bank's receiver against its directors for losses alleged to have been occasioned by their negligence in examining the cashier's accounts, a defendant cannot urge his personal ignorance that the accounts were incorrect, arising from his reliance on statements made by the officers, and examinations made from time to time by the state officials.

On bill for relief. Heard on pleadings and proofs taken in open court.

Campbell, Receiver, *v.* Watson.

The complainant, Edward S. Campbell, is the receiver, appointed by this court, of the Middlesex County Bank, an insolvent banking corporation located and doing business at Perth Amboy, in the county of Middlesex. The defendants Uriah B. and James T. Watson, J. Lawrence Kearny, Edward R. Pierce, Patrick Convery, Robert N. Valentine and John G. Wilson were, at the time of the appointment of the receiver, and at the time of the bank's failure—on July 12th, 1899—and for more than six years had been, the directors of said bank, the defendant Uriah B. Watson having been the president thereof.

The allegations of the bill are that during the period mentioned—about six years—the bank sustained losses to the extent of over three hundred thousand dollars, which produced its insolvency, and that those losses were due to the negligence of the directors in the performance of their duties.

The losses are set out in detail and classified. The greater part of them was due to the peculations and dishonest practices of the man who was the cashier during that time, George M. Valentine, the son of one of the directors.

The bank was organized under a special charter, granted by the legislature on February 1st, 1872, with a corporate life of twenty years. At the end of that period—February 1st, 1892—its existence was continued for a further period of fifty years, by virtue of a certificate made, January 15th, 1892, by the directors, in pursuance of an act entitled "A further supplement to an act entitled 'An act concerning corporations,' approved April 21st, 1876." *Gen. Stat. p. 972.*

By the third section of the act of incorporation it is declared that *the affairs of said corporation shall be managed by a board of not less than seven nor more than eleven directors,* five of whom shall be a quorum for the transaction of business, except in cases of discount, which may be regulated by the by-laws; that the said directors shall be stockholders, and shall, before entering upon the duties of said office, severally take and subscribe *an oath or affirmation faithfully to execute the trust reposed in them as directors.*

The seventeenth section declares that it shall be the duty of

Campbell, Receiver, v. Watson.

said corporation, on the first Monday in the months of January, April, July and October in each year, to publish, in one or more of the newspapers published in the county of Middlesex, a statement, under oath or affirmation, *of the actual condition of said corporation,* conforming, as nearly as may be, with the annual statement now required by law, and shall forward a duplicate thereof to the secretary of state, to be by him filed in his office.

Upon its organization the bank adopted a set of by-laws, part of the thirteenth of which is:

"There shall be a standing committee, consisting of the president and directors, appointed by the board every three months, to continue to act till succeeded, who shall have power to discount and purchase bills, notes and other evidences of debt, and who shall at each regular meeting of the board make a report of the bills and notes discounted and purchased by them since their last previous report."

The nineteenth by-law provides as follows:

"No overdrafts shall be allowed by the cashier, nor shall he omit the protest of any note, check or bill, unpaid at maturity, without the advice and consent of the president or standing committee."

The twentieth by-law is as follows:

"There shall be appointed by the board, once in every three months, a committee of three, whose duty it shall be *to examine into the affairs of the bank,* to correct the cash, and *make an inventory of the assets and compare the same with the ledger balances, to ascertain the conditions of the bank and the accuracy of the books.* The result of which examination shall be reported to the board by the committee at the next regular meeting."

The minute-books of the bank show that no committee was specially appointed under this twentieth by-law, but on the 17th of January, 1882, a finance committee was appointed, consisting of the president, Mr. Valentine and Mr. Hall, then a director, and at that meeting it was resolved:

"That the finance committee be instructed to make a thorough examination of the affairs of the bank, and report the result to the next meeting of the board;"

and that, at a meeting of the directors on February 7th, 1882, the finance committee appointed at the meeting held January 17th reported that they had carefully performed their duty, and found the books and vouchers of the bank, including the cash account, all correct.

After that finance committees were appointed in January, 1883; January, 1884, and January, 1885. No entries appear in the minutes of any report of these last committees; and the allegation of the bill is that no committee, under the twentieth by-law, to examine into the affairs of the bank, was appointed for several years, including the period of the cashiership of Valentine.

The proofs show that during all this time the insolvent bank kept a deposit account, such as is usually kept by country banks, with the Park Bank, of the city of New York; that the account was very large in its items, amounting, on each side, to two or three hundred thousand dollars a month, and that a loss, amounting to $143,916.86, arose by peculations by the cashier, perpetrated by means of false entries and charges upon the books of the insolvent bank in its account with the Park Bank. Those frauds were of three classes.

The first arose as follows: The insolvent bank kept and used a book of blank drafts on the Park Bank, with ordinary stubs for marginal entries, each check and its corresponding stub having consecutive numbers printed thereon, and the ordinary mode of drawing money from the Park Bank was by these drafts, signed by the cashier only. It was his habit to draw a draft for one sum of money, enter on the corresponding stub a less sum, and appropriate the difference to his own purposes. The credit for this draft to the Park Bank on the books of the insolvent bank was made from this stub entry.

Valentine was made cashier in January, 1892, and on October 30th, 1893, he drew a draft on the Park Bank for $2,000, and entered the amount on its stub at $1,000, and that amount was credited to the Park Bank on the books of the insolvent bank. It was paid by the Park Bank, and charged to the insolvent bank at $2,000.

At the end of each calendar month the Park Bank made up

a complete balance sheet, or account current, in detail, which was a complete transcript of its account for the month with the insolvent bank, and forwarded it by mail, together with the vouchers for its charges against the insolvent bank. In those sheets each draft was entered separately, with its amount and number. Among them, in the sheet of November 1st, 1893, was the draft for $2,000 which had been credited on the books of the insolvent bank to the Park Bank at $1,000, such credit being made from the stub. This draft for $2,000 was made in favor of the "office," which means for currency for use of the insolvent bank.

On December 20th, 1893, a draft for $1,632.47, in favor of Henry T. Chapman, Jr. (a Wall street broker), was drawn by the cashier and entered on the stub at $632.47, and credited to the Park Bank as $632.47. It was paid by the Park Bank and charged by its number as $1,632.47.

This process was repeated six times in the year 1894, namely, on July 19th, September 12th, October 1st, October 12th, November 8th and December 22d; so that the frauds perpetrated in this manner amounted, on January 1st, 1895, to over seven thousand dollars.

It was repeated twice in the year 1895, in one of which was a check for $21,000, against $20,000 entered on the stub, and one for $2,500, to the cashier's own order, with no entry on the stub, making $3,500 abstracted in that year.

There were seven abstractions in the year 1896, amounting to about four thousand five hundred dollars; four of these were for small amounts without any entries on the stubs against them.

There were four in the year 1897, amounting to about two thousand seven hundred dollars; thirteen in the year 1898, amounting to a very large sum of money; twenty in the year 1899, up to and including July 8th, amounting to a very large sum; the total abstractions by that mode being $124,158.

The allegations of the bill and the proofs show that these monthly accounts, current or balance sheets and accompanying vouchers were not concealed by the cashier, but were open to inspection and comparison with the books of the bank; but such inspection and comparison were left to the cashier, and the

transcripts and vouchers were packed away and not destroyed, and were found in the rooms of the bank by the receiver.

Another mode of abstracting money was by drawing drafts on the Park Bank for currency and giving no credit whatever therefor. There were five of those drafts, amounting to $17,000.02.

A third mode of abstracting money was to make false entries of charges of currency against the Park Bank on the books of the insolvent bank. There were eleven of these false charges and overcharges, by which $5,160 was abstracted, making, altogether, by the mode stated, the sum above mentioned, $143,916.86.

The allegation of the bill is that this loss was due to the negligence of the directors in the performance of their duties; that if a committee of the board had, in pursuance of the twentieth by-law, examined the assets of the bank, such examination would have included an ascertainment of the amount standing to the credit of the insolvent bank on the books of the Park Bank in New York, and would at once have resulted in the discovery of the very first theft—$1,000—made on October 30th, 1893, and that such discovery would have prevented any further thefts of that kind by the cashier, and would have disclosed his true character.

Another class of frauds set out in the bill was the collecting of discounted notes and the failure to credit the amount to the account of "bills receivable" in the books of the bank, whereby the account of bills receivable called for about thirty thousand dollars more than was actually found on hand in the bank at the time the receiver took possession. Among those is one note by the cashier himself for $15,000.

Another item of loss set out in the bill was overdrafts by the cashier, and demand loans without security made to, and worthless notes discounted for, him in order to make his overdrafts good in answer to the demand of the state banking examiner, amounting to $44,450.

As early as November 18th, 1895, and at the time when the abstractions by Valentine were comparatively small, the examiner of banking and insurance for the state wrote to the president

Campbell, Receiver, v. Watson.

of the bank calling his attention to various items of mismanagement, in which he used the following language:

"Another very objectionable practice is the borrowing of large sums by the cashier. The amount of his indebtedness at date of last examination was $4,500, and it is now $12,275, with but $110 margin of value in the collaterals pledged. It is difficult to perceive any other object in obtaining these loans than stock speculations. That this state of things should exist is a serious reflection upon the management of the bank and ought to be promptly remedied."

To which the president replied as follows: "The board knows all about the cashier's loan and passed on it at the time, and are satisfied with the security."

To which the banking examiner replied, on November 29th, 1895, as follows:

"My criticism of the loans to the cashier did not apply so much to the value of the security pledged as to the policy of permitting this officer to borrow large sums and for speculative ends, a practice which I am constrained to say would not be tolerated in any properly managed bank, and I regret that the board of directors should view the matter in any different light."

It was further charged in the bill that the bank made a series of loans of large sums to Henry T. Chapman, Jr., a broker, without proper security, and the bank's attention was called to it by the state banking examiner, by a letter dated November 18th, 1895, and the bank was notified that the commissioner would not allow the said notes to stand among the assets of the bank, for the reason that Chapman was unable to pay the notes, and the collaterals were valueless. To this, on November 26th, the president replied that the bank had another security for the loan, which, if it turned out as expected in the next sixty days, would be worth $60,000, and the loan would be paid, but that if it was not settled at that time, the bank would take a mortgage on Chapman's house, in Brooklyn; and that the bank also held $50,000 worth of oil paintings as collateral.

Other correspondence on this subject followed between the state banking department and the president of the bank, not necessary to be set out.

The allegation of the bill and the proof is that the pictures were in the possession of Chapman, in his house in Brooklyn; that the paper relied upon as giving the insolvent bank a lien on the pictures was valueless for that purpose, the writing itself not being recorded, and being, upon its face, merely a security for loans made before its date, and that its date was prior to any of the loans attempted to be secured by it, and that the right of the bank to the pictures was in litigation at the time of the hearing.

Another item of loss charged in the bill was the making of a bad loan for nearly sixty thousand dollars to one Hugh Ramsay upon insufficient security, namely, real estate of insufficient value, and the title to which was not perfect.

*Mr. Richard V. Lindabury* and *Mr. Sherrerd Depue,* for the complainant.

*Mr. Washington B. Williams,* for Uriah B. Watson.

*Mr. James Parker,* for James T. Watson.

*Mr. Cortlandt Parker* and *Mr. Charles C. Hommann,* for Patrick Convery and James Lawrence Kearny.

*Mr. John W. Beekman,* for John G. Wilson and Edward R. Pierce.

PITNEY, V. C.

This cause has been tried and argued with great industry and ability, and has received the best consideration I could give it, and I have now to state the result.

There is little, if any, difference among counsel as to the facts of the case, and after pretty careful examination of the numerous authorities cited, I think I can safely say that I find but little room for difference as to the law of the case.

The actual difference, and the only debatable ground, is as to the application of well-settled principles to the facts of the case.

Counsel for the complainant frankly admit that they must

show, and they claim that they have shown—*first,* negligence on the part of these directors in the performance of their duties as such, and *second,* that certain of the losses suffered by the bank were due to such negligence.

If these two elements appear, it is hardly denied by counsel for the defendants that the liability of their clients necessarily results.

It was suggested, and faintly argued by one or more of the counsel of the defendants, that the action was premature, and could not be sustained until the total losses suffered by the bank were ascertained with precision and the exact limit of defendants' liability fixed; and, as it appeared that the complainant had not finished his work of collecting and realizing the assets, that the time had not yet arrived when he could maintain an action against these defendants. I am unable to adopt that view. It abundantly appears that heavy losses had occurred before the bill was filed, many, if not all, of which it is impracticable for the receiver to recover from any parties except these defendants. And if it appears that any of these losses were caused by the negligence of the defendants, then their liability for them will be at once fixed, and may be sued for and recovered.

Moreover, where some one or more person or persons is or are primarily liable (for most of the items of loss the cashier is liable) to the bank for the amount of a loss or losses for which the directors are held liable, the directors, in equity, occupy the position of sureties for the principal debtor, and their right, upon payment of such loss to the bank or its receiver, to be subrogated to its or his rights against the party primarily liable is quite clear. So that, in practice, there is no danger that any of these defendants shall be compelled in the end to pay the receiver more than the bank's actual loss by their negligence.

The principle or rule invoked is properly applicable to the case of a suit to compel payment by stockholders of unpaid subscriptions for stock, where such payment is necessary in order to pay debts; and also to the case of an action by a creditor or creditors against directors directly to recover his or their debts against the corporation. In those cases the liability is limited by the amount which the aggregate of the debts to be paid ex-

ceeds the available assets. But the principle or rule has no application to this case.

The right and propriety of maintaining such a suit in this court was not questioned, and it is amply sustained by the authorities. The later ones are *Ackerman* v. *Halsey, 10 Stew. Eq. 356; S. C., 11 Stew. Eq. 501; Williams* v. *Halliard, 11 Stew. Eq. 373; S. C., sub nom., Williams* v. *McKay, 13 Stew. Eq. 189.*

The theory upon which the suit is sustainable in this court is that the directors are trustees for the corporation here represented by the receiver, and, as such, liable to be sued in this court. And, in my opinion, they are not only trustees for the corporation, but also, though, perhaps, in a modified sense, for the creditors of the corporation, who become such by depositing their money with the bank in the ordinary course of such business.

Banks of deposit and discount, as well as those that issue circulation, and also savings banks, are *quasi* public institutions and properly subject to statutory regulations for the protection of those who deal with them as depositors. It is true that the number of those persons in the community who are liable to suffer pecuniary loss by the failure to redeem ordinary circulating bank notes is greater, even at this day, when the comparative number of people who keep bank accounts has greatly increased, than the number liable to loss as depositors. Still, the principle is the same, and the confidence reposed in the bank and its management is the same. No one is obliged to accept payment of a debt in ordinary bank notes. He accepts it voluntarily, precisely as the depositor lodges his money in the bank voluntarily. The man who accepts a bank note in payment of a debt, and the man who makes a deposit in bank, has, each, in my judgment, a right to rely upon the character of the directors and officers of the bank, and that they will perform their sworn duty to manage the affairs of the bank according to law and devote to its affairs the same diligent attention which ordinary, prudent, diligent men pay to their own affairs; and, I add, such diligence and attention as experience has shown it is proper and necessary that bank directors should give to that business in order to reasonably protect the bank and its creditors against loss. The restrictions contained in the act of incorporation, and

Campbell, Receiver, *v.* Watson.

the requisition for the publication of periodical statements and the supervision of the banking department, all unite to maintain this principle.

But it is a matter of little consequence whether the relation of trustee and *cestuis que trustent* exists between the directors of the bank and the depositors to the same degree as it does between the corporation itself and its officers, or whether it exists at all, since the loss, if any, incurred by the negligence of the officers is primarily the loss of the corporation, and the fact that by reason of such loss it is unable to pay its depositors in full is a mere incident. If the losses had not been sufficient to render it insolvent, or even to absorb entirely its surplus of accumulated profits, and there had been no lack of assets to pay creditors, the right of the corporation to call the directors to account in the manner its receiver here has done, would have been perfect. The authorities cited by the defendants, hereafter referred to, establish that position, but the insufficiency of the assets of the bank to pay its debts gives the creditors a direct interest in its affairs, and they become the *cestuis que trustent* of the receiver, entitled to enforce all the rights of the corporation, and to collect its assets of every nature, included in which is the right to claim damages for the negligence of its directors.

I will notice here another argument advanced by counsel of defendants as to the relations between the depositors and the insolvent bank, namely, that the bank was a mere depository or gratuitous bailee of the funds deposited with it, and therefore bound to use the lowest degree of diligence in the care of the depositors' money.

In support of this position the famous case of *Foster* v. *Essex Bank, 17 Mass. 479,* was cited: But I think the principle and cases cited to support it have no application here.

The relation of an ordinary depositor of cash to the bank of deposit is that of debtor and creditor, and not of bailment; and, so far as it resembles that of bailor and bailee it is not gratuitous, but is paid for in the use of the money by the bank. The bank receives the money upon the distinct understanding that it is at once to mingle it with its own funds, so that the cash becomes at once the property of the bank, and it is entitled to loan a

large portion of it and to receive interest therefor for its own use, as a compensation for its labor and trouble and for keeping itself in such a financial condition as to be able to repay the amount at any time on demand. It is, in fact and in law, a loan by the depositor to the bank, on demand, usually without interest, or if with interest then at such a low rate as will enable the bank to loan it at a higher rate and still be able to return it on demand. The loss, however caused, by the bank of the whole or any portion of the money so received can afford no answer to the depositor's demand for his money. The trust feature, if any, in the transaction, arises out of the *quasi* public character of an ordinary bank of discount before alluded to.

In *Foster* v. *Essex Bank* the court dealt with a case of a special deposit of a package of coin in the vaults of the bank, not to be touched or used by the bank in such manner as to create the relation of debtor and creditor, but simply for safe keeping *in specie*, without compensation, precisely as if it were a precious stone or valuable work of art, but with an implied understanding that the bank should take the same care of it as of its own valuables. It was accepted by the bank as a favor to, and for the accommodation of, the depositor, who was a stockholder. The package was stolen by a dishonest employe of the bank, whose honesty, however, the directors had no reason to suspect; and it was held that the bank was not liable. Manifestly, the case has no application here.

The question to be determined, then, is simply how much money has the bank lost by the negligence of the defendants in the performance of their duty as directors? And here we must meet the question of what is actionable negligence in the concrete, as applied to the particular facts of the different specifications of negligence found in the bill and sustained by the proofs.

At the outset I make some preliminary observations:

*First.* The language on this topic of judges, as reported in the books, must, in all cases, be construed in the light of the facts of the particular case.

*Second.* The various directions in which the care of directors of banking institutions should be exercised in order to protect against fraud and theft of employes has greatly increased in

number and variety within fifty years; experience has developed modes of theft by such employes unknown and unthought of half a century ago, and these manifestations of ingenuity on the part of the thieves has been met by new safeguards on the part of the directors; so that what years ago would have been considered due diligence cannot be so considered to-day.

*Third.* So numerous have been the defalcations and dishonest abstractions of money by employes of high grade, who had, by years of right living and acting, earned the confidence of their employers, that it has become well nigh a maxim with such institutions to, so to speak, trust nobody beyond what is necessary to the practical business of the bank, and to subject the work of each one, from the highest to the lowest, to periodical investigation.

*Fourth.* That at one time, and in some instances, bank directors were unpaid servants, who were not expected to spend much time or to give much attention to the affairs of the institution, and on that account were dealt with leniently by the courts; but at this day such officers are not expected to work gratuitously, and are usually paid a fair compensation, and, whether paid or not, they are entitled to no indulgence on that account. Their names give credit and standing to the institution, and are a guarantee to dealers that its affairs will be conducted with reasonable prudence and care and according to law. They are, in my opinion, bound to acquaint themselves with the extent and mode of supervision exercised by officers of well-conducted banking institutions in the neighborhood. I cannot yield to the suggestion of some of the defendants' counsel that the fact that the institution in question was a small country bank relieved its directors from adopting the same practical measures for protection against frauds and thefts as were in use by its greater neighbors in the larger towns.

*Fifth.* Another observation is that the directors cannot be held liable for a mistake in an honest judgment upon matters properly mere matters of judgment, as distinguished from matters of administration. In matters of administration, where a duty to perform certain functions devolves upon them, they are justly held liable either for their non-performance—non-feasance—or

for their lack of ordinary diligence in their attempted performance, whereby loss is incurred. By "ordinary diligence" I mean such as is exercised by other prudent and diligent officers under like circumstances. What degree of diligence is reasonable, in the concrete, will be considered in connection with the specific acts of negligence upon which complainant relies.

And first and most important of these, because the most extensive, as well as the most glaring, are the thefts of money, by means of manipulation of, and false entries upon, the books of the insolvent bank in its account with the Park Bank. Here nearly one hundred and twenty-five thousand dollars was abstracted by the simplest of processes, and, I add, the easiest of detection. The cashier was intrusted with the drawing and signing of all drafts on that bank. The first entry of each of these transactions on the books of the bank was made by the cashier on the stub of the draft. Of course, if honestly made, those entries should correspond with the amount of the draft; but, when desiring to borrow or steal, he drew a draft for one amount and entered a less amount on the corresponding stub, and appropriated the difference to his own use. This appropriation was effected by actually drawing the cash from the Park Bank. In these instances nothing was taken from the cash drawer of the insolvent bank.

The amount so entered on the stub was, with the stub number, entered, with the other drafts drawn on each day on the Park Bank, on a blotter kept by the bank, and the sum of these items credited to the Park Bank in one item for that day. The result was that the theft could not be discovered by an examination of the books of the insolvent bank, which were complete in their character and well kept, nor by a count of the cash, which would not be affected by these entries.

But the Park Bank, at the end of each calendar month, in accordance with the usual custom in such cases, made up a balance sheet or transcript of its account with the insolvent bank, more properly called an account current, upon which each of these drafts was entered, with its number, and forwarded the same, with the vouchers, to the insolvent bank. These transcripts, or accounts current, and vouchers were all preserved

Campbell, Receiver, v. Watson.

and found at the bank by the receiver. No examination of these balance sheets or comparison thereof or of the vouchers with the books of the insolvent bank was ever made by any person, except the cashier. The duty of making this examination was cast entirely upon him; and, so far as appears, no inquiry was ever made as to any possible discrepancy in these accounts.

That the very first of these thefts would have been discovered if a simple comparison of the two accounts, item by item, had been made each month is too clear for argument. It was hardly denied by counsel for defendants.

· Much was said by counsel of defendants about the directors not being expected to do the work of an expert accountant, and reference was made to the time spent by an expert, employed by the receiver, in going through the numerous books and papers of the bank and unearthing these particular thefts, with others not so easy of discovery; but it abundantly appears that comparatively little time was spent over these monthly statements, some seventy or eighty in all, with their bundles of accompanying vouchers.

In order to comprehend how much difficult and expert work was required, it is worth while to inquire more in detail the actual mode of procedure. The account of the insolvent bank with the Park Bank was that of a depositor; packages were made up each day by the insolvent bank and sent and charged to the Park Bank. They consisted of currency, checks and drafts. In the ordinary course of business this package was charged by the insolvent bank one day before it was credited by the Park Bank, resulting in a difference in the balances shown by their respective books. Then the insolvent bank drew drafts or checks on the Park Bank, which, as we have seen, were at once credited to that bank by the insolvent bank, but were not charged by the Park Bank to the insolvent bank until they were actually presented and paid, which, in the usual course of business, would be from one to five days. Here was another source of apparent difference. The result of this course of dealing was that the balance appearing to be due the insolvent bank on the books of the Park Bank would never, at the close of a particular day, correspond with the balance then found on the books of the insolvent bank against

the Park Bank, but would naturally and necessarily be larger than the other; hence an examiner at the insolvent bank of the accounts would, at the start, take the balance sheet of the Park Bank and add to the debit side the drafts from the other bank not yet presented, and to the credit side the remittance of that day from the other bank not yet received and credited. This being done, the balance of the two sets of books should be the same. If they did not agree, a comparison and checking of the several items on each account would next be in order, and would undoubtedly reveal and locate the actual discrepancy.

Another source of apparent discrepancy which should be noticed is the transmission of items of checks and notes drawn upon or payable at banks in towns or cities outside of New York city, called "collection items." These items might be charged by one bank before being credited by the other, or *vice versa.*

Then we have the rare cases of discrepancies arising from actual errors in making entries.

When upon examination and comparison of the accounts in the manner above stated a difference still remains unaccounted for, a paper, called a reconcilement sheet, setting out the discrepancies to be accounted for, is prepared by the examining clerk, and is furnished to the other bank for examination. The discrepancies arising out of collection items sometimes give rise to some little labor and correspondence, which, however, cannot arise, and never does arise, out of those items covered by vouchers such as we are now dealing with.

In all well-conducted banks this matter of examining and reconciling the accounts with correspondent banks is usually done by the first bookkeeper, or other well advanced employe, other than the man who keeps the account, and is expected to be regularly and thoroughly done. It is absolutely necessary that it be done regularly and frequently with the accounts of ordinary correspondent banks other than the bank of deposit, for the reason that in the instances of the former accounts, settlements and payments of ascertained balances are made every few days.

This view of the work shows that there was nothing difficult in comparing the balance sheet of the Park Bank with the books

Campbell, Receiver, v. Watson.

of the insolvent bank; certainly not in going so far as to discover any discrepancy in the actual charges and credits arising out of the false entries now under consideration. It did not include anything that can properly be called expert work.

This remark must be confined to the case of a person having before him the accounts of both banks in detail, which, in this case, would be the actual books of the insolvent bank and a transcript of those of the Park Bank enabling him to compare them item by item. The case is quite different where the examination is undertaken by an officer of either the state or the national banking department. These gentlemen do not have the time, and do not attempt, and are not expected to attempt, to compare the bank accounts of the bank under examination item by item in the mode above pointed out. All that they usually do, or all that they would do in the case in hand, in the absence of suspicion, would be to take a memorandum of the balance on a particular day on the books of the insolvent bank against the Park Bank, with a memorandum of the recent drafts drawn on the Park Bank and credited to it, and the items recently charged against the Park Bank, which they designate as items *in transitu;* then open a correspondence with the Park Bank, get its balance on the same day, and then add and subtract to and from that balance the proper items in transit, in order to get the true balance. If the result is an approximate agreement they are satisfied.

Recurring for a moment to the matter of collection items, I remark that the ability to mix those items in the accounts of daily cash transactions with the Park Bank gave the dishonest cashier an opportunity to throw the official bank examiner off his guard in the slight examination he made of the Park Bank account. I will try to explain one of the methods by which this could have been done. A customer of the insolvent bank might deposit with it for collection promissory notes payable at points outside of New Jersey. A mere memorandum of those items would be made, but no credit or debit entry made on the regular books of the bank. They would be forwarded to the Park Bank in due course of business for collection, and when paid credited to the insolvent bank, increasing its balance so much. The

dishonest cashier could refrain from charging some or all of those collection items to the Park Bank for a longer or shorter time, and thereby, for the time, repress and keep down the balance shown on the insolvent bank's books against the Park Bank. It is probable that such, or a similar manipulation, was made in the early period of these thefts. Mr. Van Camp, an examiner of the state banking department, made an examination of the insolvent bank in 1895, at which time the thefts were as yet comparatively small, which examination included, and the only one which did include, an attempt to verify the Park Bank balance. He proceeded in the way I have indicated, by taking the balance from the insolvent bank and attempting, by correspondence with the Park Bank, to verify it, and did not discover any serious discrepancy; but he swears that the balance in the Park Bank must have been manipulated by Valentine in some way for the occasion. He did not have, or make use of, copies of the items of the two accounts, such as were, as we have seen, in the possession of the officers of the insolvent bank; and he swears that a simple comparison of the items of the two accounts would undoubtedly have disclosed the thefts. A careful examination of his evidence fails to satisfy me that, in the examination made after these peculations commenced, he made proper allowance in his work for the amount of drafts drawn by the insolvent bank not yet presented to the Park Bank.

I am unable, therefore, to perceive anything difficult in the task of comparing these accounts. The amount of the actual draft appeared by the draft itself and also on the balance sheet sent by the Park Bank. The amount at which it was entered on the books of the insolvent bank appears on the stub of the draft and also on the blotter for the day. The work of comparing them was no greater or more difficult than that performed by most, if not all, ordinary business men in checking off their individual bank accounts and comparing the vouchers. The mere clerical work could be done by a clerk.

The contention of the complainant is that it was the duty of the directors to make this examination and comparison with reasonable frequency by a committee, who would of course be entitled to use a clerk acting under their immediate supervision;

Campbell, Receiver, *v.* Watson.

or, if necessary, might employ an expert accountant not an employe of the bank.

He rests his contention on two grounds:

*First.* The third and seventeenth sections of the charter and the twentieth by-law. The third section of the charter provides that the "affairs of the bank shall be *managed* by a board of directors who shall be sworn faithfully to execute the trust reposed in them as directors;" and provides for the making of by-laws. The seventeenth section requires the publication of "quarterly statements of *the actual condition* of the bank," and the twentieth by-law, adopted in 1873, provides:

"There shall be appointed by the board, once in every three months, a committee of three, whose duty it shall be to examine into the affairs of the bank, to correct the cash and make an inventory of the assets and compare the same with the ledger balances to ascertain the condition of the bank and the accuracy of the books. The result of which examination shall be reported to the board by the committee at the next regular meeting."

*Second.* That by the common law of the land and the usages of banks, and independent of the by-law, the duty of the directors included the occasional examination of these accounts. That duty arises out of the duty of directors to take care of the *property* of the bank.

I think these positions well taken, and that one supports the other. The very adoption of the by-law in 1873 does, in itself, tend strongly to show what was at that comparatively early day considered as a necessary part of the duties of a board of directors. We may well suppose that the adoption of that by-law was the result of examination and inquiry among other experienced bankers to ascertain the precautions proper, if not necessary, to be taken by directors to protect the interests of the stockholders and creditors of the bank; that such examinations by committees have been a part of the routine duties of boards of directors of all banks in this vicinity for many years was abundantly proven and is well nigh a matter of common knowledge. It certainly is common knowledge among bank directors, and I deem it a part of the duty of every director in such an

institution to ascertain and learn his duties by inquiring of persons experienced in such duties and thereby to qualify himself to act. I think the authorities, which may be hereafter referred to, will sustain this position. If a man feels that he has not had sufficient business experience to qualify him to perform the duties of a director, he should either acquire the knowledge by inquiry, or refuse to act.

It can hardly be contended that a comparison of the books of the bank with the accounts on the books of the Park Bank was not included within the scope of the by-law. The duty is to

"make an inventory of the assets and [1] compare the same with the ledger balances to ascertain the condition of the bank, and [2] the accuracy of the books."

Now, the assets of an ordinary bank of deposit consist mainly and generally of three classes—*first,* cash in the vault of the bank; *second,* promissory notes and other negotiable choses in action, usually denominated bills discounted, and *third,* the amount due to the bank from other banks, including, of course, and most important of all, its bank of general deposit in the city of New York, or other large city near which it is located. The amount of each of these items appears upon the ledger, under the appropriate heads, and if the books are honestly and accurately kept the amount so shown is the true amount.

Now, in order to ascertain the amount of these different items of assets and to compare them with the ledger balances, it is necessary to ascertain the amount of each, without the aid of the ledger with which they are to be compared, and independent of the books. To rely upon the books alone for that purpose is simply absurd. The cash and the bills discounted and other tangible assets must each be seen, handled, inspected and counted; and the amount due from other banks must be ascertained in some manner equally efficient. Hence, as I have said, the execution of the mandate of this by-law necessarily included an ascertainment of the amount due to it from the Park Bank, *ab extra* the books of the insolvent bank, and this could easily be done, as has been stated, by an examination of the monthly balance

Campbell, Receiver, v. Watson.

sheets and vouchers furnished by that bank and open to the inspection of the directors. Any concealment of either by the cashier would have led to suspicion and detection, quite as surely as the production of the balance sheets, for I hold that if, for any reason, no balance sheets had been produced to the examining committee, it would have been their duty to call on the Park Bank for the same, and, if need be, make an examination of the books of that bank on their own account.

Again, it abundantly appears, as we have seen, that it is the universal custom of all banks to require some employe, naturally the bookkeeper, to examine, for correction, all the accounts of correspondent banks as often as balance sheets are rendered, and if differences are found, to enter into correspondence for their correction; and for this purpose what are called reconcilement sheets are prepared and exchanged. And if that practice had been pursued in this bank, with regard to its account with the Park Bank, and the work had been intrusted to the general ledger bookkeeper or any other clerk, the thefts of the cashier would have been instantly discovered by such examiner, and, in the absence of collusion between the examining bookkeeper or clerk and the cashier, would have been reported to the president and officers of the bank. Besides, the committee of directors could have at least asked the bookkeeper whether these accounts did agree; could have required him to show them the reconcilement sheets in which the differences, if any, would, in the regular course of business, be shown, item by item. This was an extremely simple matter, and without saying that it was all that was required of the directors, I will say that I think it would have led to detection. I have said, and I repeat, that the task of examining these bank accounts should be imposed upon some employe other than the one whose work is being examined. In all well-managed banks this is done as far as practicable; and I feel compelled to say that I deem it bad management to intrust the checking up of the accounts of the bank of deposit solely to the employe who draws and signs the checks on that bank.

Two or three other specifications of theft, by means of the account with the Park Bank, may be properly noticed here.

27

Campbell, Receiver, *v.* Watson.

*First.* Four items of drafts of currency from the Park Bank made by the cashier, which were never credited, even in part, to that bank on the books of the insolvent bank, namely:

| | |
|---|---:|
| November 10th, 1893....................... | $3,000 00 |
| May 11th, 1893............................ | 1,000 00 |
| January 1st, 1899......................... | 1,000 00 |
| January 10th, 1899........................ | 5,000 02 |
| | $10,000 02 |

These funds were probably drawn by Valentine in person, and appropriated to his own use.

*Second.* A charge on the books of the insolvent bank to the Park Bank, July 5th, 1899, of $7,000, for a check or note of the R. copper works, which had already been charged to that bank. The cashier took the money for his own use from the drawer of the insolvent bank.

*Third.* Overcharges and false charges on the books of the insolvent bank to the Park Bank, in twelve items, between January 10th, 1894, and June 13th, 1899, amounting to $5,160.50.

It will be observed that the first of these thefts occurred on November 10th, 1893, ten days after the first false charge entered on the check stub.

Now, these abstractions, it must be observed, were not quite so easy of detection as the false entries on the check stubs, which latter furnished two modes of detection—one by a mere comparison of the checks with the stubs, and another, a comparison of the two accounts, item by item. Nevertheless, the latter mode, namely, comparison of the accounts, item by item, was, in my judgment, sufficiently simple and easy, and would have at once detected the first false charge.

Now, before considering the various excuses adduced by the defendants for their failure in this behalf, let us consider the second proposition maintained by the complainant, and which is necessary for his success on this part of the case, namely, that this neglect led to pecuniary loss by the bank.

Valentine was elected cashier in January, 1892, and his first peculation was in October, 1893. During the intervening period twenty monthly statements or balance sheets had been rendered,

with their accompanying vouchers, by the Park Bank, and not one of them had ever been examined or been looked at or inquired after by the president or any member or committee of the board, or by anyone—even an ordinary clerk—on their behalf. They trusted entirely to the cashier to see that the accounts corresponded. They never attempted to make any inspection and summation of the assets for any purpose, but accepted the cashier's statements as reliable, both for the purpose of quarterly statements to be published and for dividends. This lack of inspection must have struck him forcibly, for he came to the bank, as the proof shows, well recommended as an expert banking clerk from the Park Bank where he had served. It soon became evident to him that the directors had implicit confidence in him and were not disposed to overlook or inspect this part of his work. Here was a chance offered to him to borrow money without security or danger of immediate detection; and he took advantage of it on October 30th, 1893, to abstract and borrow $1,000 in the manner stated. I say "borrow," for it is quite plain that his was the all-too-familiar case of a bank officer who was fascinated by Wall street speculations and tempted to temporarily borrow from his bank the margin necessary to operate on that street, in the full expectation of repaying it. Losing in his first venture, and not being discovered, he tried again on December 20th and abstracted another $1,000; and still losing he kept on borrowing, hoping finally to find himself on the winning side and to be able to repay all his abstractions. In short, it was the old, old story, so oft repeated in similar cases; many of them cases of older and longer tried bank officials who yielded at last.

Now I find it impossible to escape the conviction that if in practice the slightest attention had, from the start, been paid by the president or directors, or a clerk under their direction, to the Park Bank accounts, Valentine would never have borrowed one cent from the bank in that way—what he might have done in other ways is not now in question—and, of course, as before remarked, if he had ventured to face a threatened examination, such examination, when made, would have disclosed the very first loan and exposed his unreliable character.

But the case on this part of it does not stop here. One point made by the defendants and pressed with great earnestness was the very high character of Valentine, and it was urged that they were justified in trusting him. · I shall probably deal at more length with this point further on; but I stop to say just here, so manifest was it from the transactions of the bank as disclosed by the books, that Valentine was engaging in improper outside transactions, that the cursory and imperfect examination made by the banking department led the commissioner of banking, as early as November 18th, 1895, to write a letter to the president of the insolvent bank, in which, after commenting unfavorably upon several loans of the bank, he uses this language:

"Another very objectionable practice is the borrowing of large sums by the cashier. The amount of his indebtedness at date of last examination was $4,500, and it is now $12,275, with but $110 margin of value in the collaterals pledged. It is difficult to perceive any other object in obtaining these loans than stock speculation. That this state of things should exist is a serious reflection upon the management of the bank, and ought to be promptly remedied. While the directors have the same right as others to borrow its funds on good business paper or other security, and for legitimate business uses, within proper limits, it is plainly contrary to their trust to vote themselves large sums upon inadequate security or for speculative ends, and the responsibilities and duties of the cashier are such as to forbid his becoming a borrower for any amount, unless the circumstances are very exceptional, but under no conditions for purposes of speculation."

Now at the date of that letter the amount of the peculations through the manipulation of the accounts with the Park Bank was comparatively small—about eight thousand dollars. Here was sufficient to put the directors on their guard.

I conclude, therefore, that the cashier was enabled to perpetrate the frauds, by the manipulation of the Park Bank account, in the manner he did by the neglect of the directors to perform their duty as such with regard to that account, so that the second proposition of the complainant is fully sustained.

Now, let us consider the defence set up to this case; and first, it was suggested that the by-law relied upon by complainant had died and had become no longer binding, by reason of the expiration, in 1892, of the original charter, and that it was not revived

Campbell, Receiver, *v.* Watson.

by the extension of the bank's corporate existence by the certificate of extension made in that year.

I am unable to perceive the least strength in this argument.

The language of the certificate filed in the office of the secretary of state is this:

"The Middlesex County Bank desires that the period of its existence and its corporate powers shall be extended for the term of fifty years from the first day of February, 1892."

The provision of the act is:

"That upon making and filing such certificate, the period of the existence of such corporation shall be extended as declared in such certificate as fully as if the said period had been named in the original charter or certificate of organization of such corporation." *Gen. Stat. p. 972.*

I can find here no ground for the conclusion that there was any hiatus in the corporate existence of the bank.

Another point made was that the fact that the by-law in question had been disregarded and fallen into disuse for so long a time was evidence from which the court might presume a repeal of it.

I think the advancement of this argument hurts, rather than helps, the defendants. If I am right in my conclusion that the by-law is a wholesome and proper one, well contrived to protect the assets of the bank, then its repeal must be considered as a deliberate attempt on the part of the directors to give themselves a license to be negligent in the performance of their duties; and, of course, any conduct which would indicate a repeal by implication is subject to the same criticism.

Another suggestion advanced in behalf of the defendants is that they had a right to rely upon the examinations made by the state examiners. The evidence does not show when the practice of making examinations by the employes of the banking department commenced. The law authorizing it has been on the statute-book since 1850. There is no entry on the minutes of the bank on that subject; but it does appear that no examining committee was appointed by the board of directors, or that any examination was had, until January 7th, 1882, nine years

after the bank commenced business. About that time—January, 1882—as is disclosed by the minutes, some dissatisfaction arose among the stockholders at the management of the bank, and apparently particularly at the capacity or conduct of its then cashier. On the day just named, after the organization of the board of directors just elected, the usual election of the president and other officers, except the cashier, was had, but that of the cashier was postponed, and three committees, of three each, were appointed by the president of the board—one on finance and one on the by-laws; and it was resolved:

"That Com. on by-laws be instructed to compare by-laws with charter and to report to next meeting of the board any amendments the said by-laws may require. Resolved, that the finance committee be instructed to make a thorough examination of the affairs of the bank, and report the result to the next meeting of the board."

Both the committees afterwards reported—that of the finance committee having been delayed, in pursuance of leave granted for that purpose at their request, and its report was that the assets of the bank were found correct. No other report was ever made on that subject.

On January 16th, 1883, another committee on by-laws was appointed. The first committee on by-laws was Mr. Uriah B. Watson, the present president, and two gentlemen named Hall, who shortly afterward sold their stock. The second committee on the by-laws was Messrs. James T. Watson, Convery and Kearny, three of the defendants herein, and at the time of their appointment Mr. Uriah B. Watson was president.

These minutes show that the attention of the gentlemen named, namely, Uriah B. Watson and James T. Watson and Messrs. Kearny and Convery, was called to the existence of the by-law in question and the propriety of acting under it; and there is nothing to show that the practice on the part of the state banking department of making occasional examinations was not then in vogue.

But independent of that consideration, I am of the opinion that the fact that such examinations were occasionally made furnishes no excuse to the directors for not acting under the by-

law. Such official examinations were made quite infrequently—once in one or two years—and, at best, could only justify a reduction of the number and frequency of the examinations of the directors. It appears quite clearly from the evidence that the directors of national banks do not rely upon the examinations made by the national bank department examiners further than just indicated. They do, however, time their own examinations to intervene between the semi-annual examinations of the national banking department.

And just here is felt the force of the provision of the charter requiring the publication in the newspapers of quarterly statements showing the *actual condition* of the bank. I hold that the words "actual condition" mean something more than the condition shown by the books of the bank. In my judgment, they mean that the statement shall show what actually exists in the way of assets, and that those assets bear, approximately, at least, the value at which they are stated in the statement. Those statements are made and published for the benefit of the public, so that the dealers with the bank, the depositors as well as bill-holders, if any there be of the latter, may know what is the actual condition of the institution with which they are dealing; and it is the duty of the directors to use reasonable means of knowing that the statements so published are reasonably accurate and reliable.

An excuse was suggested in favor of some of the defendants that they were not aware of the existence of the by-law in question. It seems to me that such ignorance can form no sufficient excuse, even in the case of those of whom it can be truly said they may not have known of its existence. Four of the defendants, namely, those who, as we have seen, were appointed on committees on by-laws, seem to me to be estopped from setting up that they did not know of its existence. With regard to three—Messrs. Pierce, Valentine and Wilson—they probably never had their attention called to it. I adhere to the opinion already expressed that it was their duty to inform themselves, by inquiry of other persons known to be familiar with the duties of directors, as to those duties; and if they had done so they would have learned, as I have already stated, that one of

their duties was to guard against loss by theft of the officers and employes of the bank. They were all men of intelligence. One of the three mentioned—Mr. Valentine—the father of the cashier, though answering, did not appear or make any defence at the hearing, and Messrs. Wilson and Pierce both admit that they knew from general information that large sums of money had from time to time been stolen by trusted officers of banking institutions, but fall back upon their entire confidence in the integrity of the cashier.

It seems to me quite impossible from the judicial standpoint to hold that these defendants are excusable on the ground of their ignorance of the provisions of the charter of their corporation and the by-laws made according to law, and thereby forming a part of their charter.

The defence principally relied upon is that the standard of care and attention set up by complainant and required in order to insure the discovery of these frauds is too high; that it is higher than judicial authority sanctions, and higher than public policy requires—so high indeed as to prevent any ordinary intelligent citizen from assuming the office. It is argued that it requires of a director to be an expert bookkeeper, as well as a spy and a detective, and to exercise these latter qualifications in an offensive manner over the conduct of, and to entertain continued suspicion of, a person in whom he has perfect confidence and whom he has no reason to suspect.

Counsel for complainant deny that this standard of care and diligence includes the exercise on the part of the directors personally of any of the expert work above stated. I agree with them. I am unable to perceive anything offensive to any person occupying a position of trust and confidence in having his work examined and approved by competent authority. Such examination may be and usually is conducted openly, in his presence, and includes nothing in the nature of espionage or detective work; nothing secret or underhanded. It requires no suspicious watching from hour to hour, or day to day. On the other hand, I think that every such person should be only too glad to have his work examined and approved as often as his superior shall see fit to do so. I cannot imagine a cashier taking offence at

the appearance of a committee of the directors to take an account of the assets of the bank in his care and charge and proving thereby that the books of the bank correspond therewith, and therefore are truthful, as well as the statement founded thereon and furnished by him daily to the directors. I have already shown that the examination necessary to discover the frauds here in question did not require the work of an expert accountant, nor the uncovering of any ingenious contrivances for the concealment of the frauds. No such contrivances were, as it appears to me, resorted to by this cashier. The monthly transcripts from the Park Bank and vouchers were neither altered, destroyed nor concealed.

The defendants' counsel were driven to the position that the directors were under no obligation of duty to examine the assets of the bank in order to test the accuracy of the daily statements entered on the books of the bank, unless they suspected the honesty of the cashier, and as they did not suspect his honesty they cannot be held liable for his thefts.

Numerous authorities were cited in support of that proposition, most of which I have examined, and will notice the most important. I will, however, remark in advance that judicial expressions are found in the books relieving the directors from acting as spies and detectives upon their officers and from assuming an attitude of continuous suspicion without cause, and some confusion has arisen in the application of these judicial expressions.

As I understand it, the wisdom and propriety, and, from the business man's standpoint, the necessity of these periodical examinations does not rest upon suspicion of cashiers and tellers of banks as individuals, or as a class, but upon what experience has shown to be a liability of the best and most reliable men to yield to temptation and go astray and to abstract funds without any intention or expectation of ultimately defaulting.

To prevent, as far as practicable, this practice and its sometimes unfortunate results, it is the duty of good business management to devise such measures as are practicable. But this duty of prevention does not require, in the absence of actual

suspicion of honesty, a daily watching of each motion and action of the officer who has opportunity to borrow or steal.

And just here is the point where some judicial expressions are liable to mislead. No one, I presume, will go so far as to suppose that any system of supervision on the part of directors practicable at this day will absolutely prevent a dishonest cashier or teller who has charge of the cash of the bank from stealing some of it, and stealing it in such a manner that not a shadow of ground would exist for holding the directors liable for the loss. It is absolutely necessary to trust some one with the custody of the cash—usually in small banks, as here, the cashier. The directors do not occupy the position of guarantors of his honesty. They are bound only to exercise such care and diligence in looking over his work as experience has shown is at once proper as well as practicable, and as is exercised by other experienced directors, and as is required by their charter and by-laws.

We come now to the authorities, and the first and oldest is *Percy* v. *Millaudon, 8 Mart. (N. S.) 68 (1829).* There the action was brought by a stockholder of a bank against its directors to compel them to make up losses which had occurred through their carelessness in the management of the bank. The directors in that case were unpaid, and were finally held liable for a considerable sum of money, on three counts: (1) permitting the president and cashier to discount notes from the funds of the bank, without the assent and intervention of five directors, as required by the rules and regulations of the bank; (2) permitting purchases to be made of the stock of the bank out of the funds of the bank by the president and cashier, at a rate above the known true value thereof, or allowing them to take and use the money of the bank, contrary to the rules and regulations thereof; (3) not opposing an illegal measure of the board of directors to discharge the cashier and his sureties from the responsibility on the official bond of the cashier.

The principle laid down by the court was as follows: "Directors are the agents or mandataries of the stockholders, and as such undertake the management of its affairs according to the rules prescribed by their charter and by the by-laws made in pursuance thereof. The only correct mode of ascertaining

whether there was fault in the agent is by inquiring whether *he neglected the exercise of that diligence and care which were necessary to a successful discharge of the duty imposed upon him.* That diligence and care must depend upon the nature of the undertaking.

"There are many things which, in their management, require the utmost and most scrupulous attention, and where the agent who undertakes their direction makes himself liable for the slightest neglect.

"There are others where the duties imposed are presumed to call for nothing more than ordinary care and diligence, and where the exercise of that degree of care suffices.

"The directors of banks, from the nature of their undertaking, fall within the class just mentioned while in the discharge of their ordinary duties. It is not contemplated, by any of the charters which have come under our observation, that they should devote their whole time and attention to the institution to which they are appointed, and guard it from injury by constant supervision. Other officers, on whom compensation is bestowed for the employment of their time in the affairs of the bank, have the immediate management. In relation to these officers, the duties of directors are those of control, and the neglect which would render them responsible for not exercising that control properly must depend on circumstances, and, in a great measure, be tested by the facts of the case. If nothing has come to their knowledge to awaken suspicion of the fidelity of the president and cashier, ordinary attention to affairs of the institution is sufficient. If they become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required, and a want of that care certainly makes them responsible."

The next case in point of time is the celebrated one of *Scott* v. *Depeyster, 1 Edw. Ch. 513,* decided by Vice-Chancellor Mc-Coun in 1832. It was an action by a stockholder (as in *Percy* v. *Millaudon*) in an insurance company against the directors to hold them responsible for certain thefts of their secretary, one Kane. Two grounds of liability were set out.

One was a charge that they had permitted the funds of the

corporation to be invested in securities not authorized by their charter, and some of the headnotes of the case and expressions of the learned vice-chancellor apply to that part of the case.

The second ground was that they had permitted their secretary, acting as cashkeeper, to have such unconstrained care and custody of the funds of the company that he had stolen certain sums of money, from time to time, during a period of three years, amounting, in the aggregate, to $177,166.

The proof on this second part of the case was that the secretary, who was intrusted with handling the cash, used two methods to further his abstractions—first, he pretended to deposit funds in the bank, in the ordinary course of business, which were not deposited, and, in order to cover up his conduct, he made false and forged entries on the regular bank pass-book, which entries purported to be made, in the ordinary course of business, by the teller or other officer of the bank who received the money; and he also charged to the bank on the books of the insurance company the amounts so purporting to be deposited.

His second mode was to alter checks regularly drawn and countersigned by the president, given for small sums to pay bills against the corporation, by increasing the amount mentioned in them from tens to thousands, &c., then paying in cash the amount of the bill to pay which the checks were drawn, and drawing the money on the altered checks in person and appropriating the difference to his own use. These checks were falsely entered on the pass-book as charges against the bank at the amount originally written in them.

It will be seen that both these methods adopted by the secretary in that case somewhat resembled those practiced by Valentine in the present case. Both of Kane's methods included actual forgery, and, like the present case, they extended over several years of time. It appeared, however, that the directors took a proper method of ascertaining, at stated periods, the condition of the insurance company, in order to warrant the making of a dividend, namely, they appointed a committee to make periodical examinations of the assets of the company, who, in their examinations, relied upon the entries in the regular bank pass-book and the accounts kept of the checks drawn, but made no other exami-

nation, and did not inquire at the bank what was the balance to the credit, or otherwise, of the insurance company.

The vice-chancellor expressed great surprise that the frauds were not discovered earlier, and dilated on the ease with which they might have been discovered by going to the bank and getting the true balance there. But the defendants fortified themselves by the evidence of a large number of the best business men in New York City, to the effect that the course pursued by the directors of the insurance company and their committees was the usual course pursued by other committees and directors and good business men in New York City. Upon that ground, and that alone, the defendants succeeded.

It is to be observed that the committee of the directors actually made the examination which prudence required them to make, and were furnished by Kane, the secretary, with what purported to be a copy of the account on the books of the bank, made by an officer of the bank, and had no reason to suspect its genuineness. In fact, they were deceived by forgery.

The bank pass-books in that case correspond with the monthly transcripts of the Park Bank in the case under consideration, and if, in the present case, a committee had been appointed and had proceeded, as in *Scott* v. *Depeyster,* to investigate the condition of the bank, and had been furnished by the cashier with forged transcripts, or accounts current, purporting to have been made by the Park Bank, which corresponded with the books of the insolvent bank, and were so well forged as to have escaped ordinary attention, and had actually deceived the committee, this part of the case now made against them would have lost most, if not all, of its force.

The following are such of the headnotes of *Scott* v. *Depeyster* as I deem worth transcribing:

"Persons who become directors or managers of a corporation, place themselves in the situation of trustees; and the relation of trustees and *cestuis que trust* is thereby created between them and the stockholders. The former are obliged to take the same care and use the same diligence as factors and agents. They are answerable not only for their own fraud and gross negligence, but also for all faults which are contrary to the care required of them.

"Directors are to be looked upon as bailees of the property. And as they are persons generally having an interest in the stock, they are not bailees who are to derive no benefit from their undertaking, and, therefore, to be held responsible for slight neglect, but they act in relation to a bailment beneficial to both parties. And the rule then is, they must answer for ordinary· neglect; and 'ordinary neglect' is understood to be the omission of that care which every man of common prudence takes of his own concerns."

In the course of his opinion the learned vice-chancellor says:

"The persons who become directors or managers of a corporation place themselves in the situation of trustees; and the relation of trustee and *cestuis que trust* is thereby created, for the time being, between them and the stockholders. In the language of the charter of the present company, their duty is to manage the stock and property and conduct the affairs and concerns of the corporation, selecting one of their number for president. For the discharge of these duties they are chosen; and, by accepting the appointment, they assume a responsibility at least as extensive as that of any other description of trustees."

The difficulty which the learned vice-chancellor had in coming to the conclusion which he did is expressed at the bottom of page 545 and page 546.

The next case, in order of time, which I deem it worth while to note, is *Spering's Appeal, 21 P. F. Sm. 11,* decided in 1872 by the supreme court of Pennsylvania. It arose out of the failure of a banking and insurance company, which had a capital stock and stockholders, but had also a savings bank aspect. It failed shortly after the outbreak of the Rebellion, at a time when such disasters were frequent, and made an assignment for the benefit of its creditors. The assignee sought to hold the directors liable for some of the losses. The only ground sustained by the proofs was that the directors had invested the funds in bad securities not authorized by law. It appeared that, in making these investments, they acted under the express advice of counsel. The court decided that they could not be held liable, for it was, at least, a mistake of judgment. It appeared that they acted gratuitously. In his opinion Mr. Justice Sharswood (at *pp. 20, 21*), says:

"It is by no means a well-settled point what is the precise

relation which directors sustain to stockholders. They are undoubtedly said in many authorities to be trustees, but that, as I apprehend, is only in a general ,sense, as we term an agent or any bailee intrusted with the care and management of the property of another. It is certain that they are not technical trustees. They can only be regarded as mandataries—persons who have gratuitously undertaken to perform certain duties, and who are, therefore, bound to apply ordinary skill and diligence, but no more. Indeed, as the directors are themselves stockholders, interested as well as all others that the affairs and business of the corporation should be successful, when we ascertain and determine that they have not sought to make any profit not common to all the stockholders, we raise a strong presumption that they have brought to the administration their best judgment and skill. *Ought they to be held responsible for mistakes of judgment or want of skill and knowledge?* They have been requested by their co-stockholders to take their positions, and they have given their services without compensation. We are dealing now with their responsibility to stockholders, not to outside parties—creditors and depositors. *It is unnecessary to consider what the rule may be as to them.* Upon a close examination of all the reported cases, although there are many *dicta* not easily reconcilable, yet I have found no judgment or decree which has held directors to account, except when they have themselves been personally guilty of some fraud on the corporation, or have known and connived at some fraud in others, *or where such fraud might have been prevented had they given ordinary attention to their duties.* I do not mean to say, by any means, that their responsibility is limited to these cases, and that there might not exist such a case of negligence or of acts clearly *ultra vires* as would make perfectly honest directors personally liable."

The learned judge then goes into an elaborate examination of authorities, and afterward (on *p. 24*) sums up the law as follows:

"It seems unnecessary to pursue this investigation any further. These citations, which might be multiplied, establish, as it seems to me, that while directors are personally responsible to the stockholders for any losses resulting from fraud, embezzlement or will-

ful misconduct or breach of trust for their own benefit, and not for the benefit of the stockholders, *for gross inattention and negligence by which such fraud or misconduct has been perpetrated by agents, officers or co-directors,* yet they are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they are honest, and provided they are fairly within the scope of the powers and discretion confided to the managing body."

It is quite plain from this that the learned judge had in mind the making a clear distinction between a mistake in judgment and a mistake in administration, rather than a careful definition of duty or of negligence.

The next case is *Wakeman v. Dalley, 6 Sick. 27.* This was an action in tort by a stockholder against a director in an insurance company for false representation as to the true condition of the company, whereby the plaintiff was induced to purchase certain shares of stock therein and to pay for them much more then they were worth. There was actual fraud on the part of those who launched the insurance company, and it was perpetrated by procuring from the insurance department of New York a charter or certificate of organization upon the pretended payment of $150,000 in cash as capital. The cash was actually paid, but was immediately exchanged for worthless bonds and mortgages. The defendant Dalley was not a party to the fraud, and became a director after the company was launched and long after the perpetration of the fraud, and was not aware of it. He made no representations to anybody beyond allowing his name as director to be printed on a card showing the assets of the company to be $150,000. He was held not to be responsible in tort. The directors who knew of the fraud were held.

In his opinion Judge Earl uses the following language, relied upon by the defendants:

"As he was a director must we impute to him, for the purpose of charging him with fraud, a knowledge of all the affairs of the company? If the law requires this, then the position of a director in any large corporation like a railroad, or banking or insurance company, is one of constant peril. The affairs of such a company are generally, of necessity, largely intrusted to man-

aging officers. The directors generally cannot know, and have not the ability or knowledge requisite to learn, by their own efforts, the true condition of the affairs of the company. They select agents in whom they have confidence and largely trust to them."

As applied to the facts in that case this statement of the law may be accurate enough, because it appeared that the mortgages which represented the capital were in actual existence, and it did not appear that Dalley had any reason to suspect their value or any opportunity to investigate; but, as a general proposition, I am unable to adopt it. For one thing, its classification is faulty. A railroad and a bank differ from each other with regard to the ability of the directors to estimate the value of their assets. I think that the directors of a bank have, or ought to have, the ability to ascertain and learn by their own efforts the true condition of the affairs of the bank.

Further, the question is not whether the directors might, through inexperience or what not, fail to uncover a fraud, but whether they ought not to make some reasonable endeavor to take an inventory of their assets with reasonable frequency. I find a more solid and reasonable ground for the decision in *Wakeman* v. *Dalley* in Mr. Justice Gray's concurring opinion, commencing on page 36.

Another case is *Arthur* v. *Griswold, 55 N. Y. 400.* That was an action of tort by a creditor of a corporation against the directors, founded upon a false and fraudulent statement made by some of the directors as to the pecuniary responsibility and condition of the company, whereby the plaintiff had been induced to loan them a large sum of money; and it was held that a director who had not participated in the fraudulent representation made by his co-directors could not be held liable therefor. This case has no application to the one in hand.

The next case in point of time, and I may add in importance, is *Hun* v. *Cary, 37 Sick. 65.* The citations of authority by counsel and court are exhaustive, and the reasoning given for the result is, in my judgment, sound. It was an action by the receiver of a savings bank against the directors to recover

a large sum of money because the directors had purchased a piece of real estate and erected a large building for a banking-house upon it at a time when the financial condition of the bank did not warrant it, with the result that the bank failed. They were held liable. Mr. Justice Earl, defining the duties of directors, uses this language:

"When one deposits money in a savings bank or takes stock in a corporation, thus divesting himself of the immediate control of his property, he expects, and has the right to expect, that the trustees or directors, who are chosen to take his place in the management and control of his property, will exercise ordinary care and prudence in the trusts committed to them—the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. When one voluntarily takes the position of trustee or director of a corporation, good faith, exact justice and public policy unite in requiring of him such a degree of care and prudence, and it is gross breach of duty—*crassa negligentia*—not to bestow them.

"It is impossible to give the measure of culpable negligence for all cases, as the degree of care required depends upon the subjects to which it is to be applied. What would be slight neglect in the care of a quantity of iron might be gross neglect in the care of a jewel. What would be slight neglect in the care exercised in the affairs of a turnpike corporation, or even of a manufacturing corporation, might be gross neglect in the care exercised in the management of a savings bank, intrusted with the savings of a multitude of poor people, depending for its life upon credit, and liable to be wrecked by the breath of suspicion. There is a classification of negligence to be found in the books, not always of practical value, and yet sometimes serviceable, into slight negligence, gross negligence, and that degree of negligence intermediate the two, attributed to the absence of ordinary care; and the claim on behalf of these trustees is that they can only be held responsible in this action, in consequence of gross negligence, according to this classification. If gross negligence be taken according to its ordinary meaning—as something nearly approaching fraud or bad faith—I cannot yield to this claim; and if there are any authorities upholding the claim, I emphatically dissent from them.

"It seems to me that it would be a monstrous proposition to hold that trustees, intrusted with the management of the property, interests and business of other people, who divest themselves of the management and confide in them, are bound to give only slight care to the duties of their trust, and are liable only in case of gross inattention and negligence; and I have found no authority fully upholding such a proposition. It is true that authorities are found which hold that trustees are liable only for *crassa negligentia,* which literally means gross negligence; but that phrase has been defined to mean the absence of ordinary care and diligence adequate to the particular case."

He then comments upon *Scott* v. *Depeyster, Spering's Appeal, Hodges* v. *New England Screw Co.* and other cases, and, in speaking of *Spering's Appeal,* says:

"In *Spering's Appeal* Mr. Justice Sharswood said that directors 'are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they were honest, and provided they are fairly within the scope of the powers and discretion confided to the managing body.' As I understand this language, I cannot assent to it as properly defining, to any extent, the nature of a director's responsibility. Like a mandatary, to whom he has been likened, he is bound, not only to exercise proper care and diligence, but ordinary skill and judgment. *As he is bound to exercise ordinary skill and judgment, he cannot set up that he did not possess them.* When damage is caused by his want of judgment, he cannot excuse himself by alleging his gross ignorance. *One who voluntarily takes the position of director, and invites confidence in that relation, undertakes, like a mandatary, with those whom he represents, or for whom he acts, that he possesses at least ordinary knowledge and skill, and that he will bring them to bear in the discharge of his duties.* Such is the rule applicable to public officers, to professional men and to mechanics, and such is the rule which must be applicable to every person who undertakes to act for another in a situation or employment requiring skill and knowledge; and *it matters not that the service is to be rendered gratuitously.* These defendants voluntarily took the position of trustees of the bank. They invited depositors to confide to them their savings,

and to intrust the safekeeping and management of them to their skill and prudence. They undertook, not only that they would discharge their duties with proper care, but that they would exercise the ordinary skill and judgment requisite for the discharge of their delicate trust."

It was urged against the authority of this case that it was one of a savings bank, and that the duties of directors of a savings bank required a greater exercise of care and diligence than those of an ordinary bank of discount; and, as I shall have occasion hereafter to refer to the authorities in this state, I may as well stop here to consider this argument.

It is true that the laws of our state, and, I presume, of other states, have thrown a great variety of safeguards around the management of pure savings banks, and for the good reason that usually their directors are not chosen by the depositors, but are self-perpetuating, themselves choosing new directors to fill up vacancies as often as they occur, and, besides, in practice, they cannot easily be held to account by the ordinary depositors. But I apprehend that the relations between directors of a savings bank and the depositors are, for present purposes, precisely those that exist between the stockholders of an ordinary bank of discount and its directors. The depositors of a savings bank are not creditors of the bank in the sense in which depositors in an ordinary bank are. They are themselves the stockholders, in that each and everyone of them is directly interested in the earnings of the bank. The semi-annual payments of interest to the depositors are nothing more nor less than a division, *pro tanto*, of the earnings of the bank for the period covered, and are properly called dividends, so that the relation of trustees and *cestuis que trustent* arises between the managers of a savings bank and its depositors precisely as it does between the directors in an ordinary bank of discount and its stockholders.

The next case relied upon by the defendants is *Swentzel* v. *Penn Bank and others, 147 Pa. St. 140.* The case is voluminous and the facts appear quite fully in the opinion of Mr. Justice Ewing, the presiding judge of the Pittsburg common pleas. He reviews the authorities at length, and I consider his criticisms on some of those here cited as valuable. The frauds for which

the directors were sought to be charged were perpetrated by the president and cashier of the bank mainly by means of overdrafts of individual accounts, those of the officers and of their particular friends, and in some instances of mere dummies.

The directors, in pursuance of a settled practice of the bank, appointed an auditing committee, who, at stated intervals, examined the affairs of the bank, counted its cash and examined its assets, and saw that they corresponded with the books.    It would seem that their work was done much as the work of examining committees in this state is expected to be done.    They found nothing wrong.    The reason of their failure was that they did not examine the individual ledger accounts where the overdrafts were plainly marked in red ink and were quite visible.    It is clear from the opinion of Mr. Justice Ewing that he thought the defendants were guilty of negligence, and that the master who had heard the case in the first instance and reported in favor of the defendants might well have come to a different conclusion, and he rather severely criticises the conclusion of the master on matters of fact.    But he declared that the error was not so palpable as to warrant a reversal of his finding.

The supreme court, on appeal, put their affirmance wholly on the ground that by the well proven and universal usage of the Pittsburg banks, founded on a sufficient business reason, directors were not allowed to examine the individual ledger accounts, and therefore the directors and their auditing committee were not guilty of negligence in failing to discover the overdrafts.

There are expressions in the opinion of Chief-Justice Paxson which, if applied generally, tend in some degree to help the defendants' case; but limited by the facts of the case and the circumstances that the directors in that case acted without compensation, I cannot so deem them.    He states the rule thus:

"In regard to what is ordinary care, regard must be had to the usages of the particular business.    Thus, if the director of a bank performed his duties as such in the same manner as they were performed by all other directors of all other banks in the same city, it could not fairly be said that he was guilty of gross negligence; and care must be taken that we do not hold mere gratuitous mandataries to such a severe rule as to

drive all honest men out of such positions. * * * Holding, then, the rule to be that directors, who are gratuitous mandataries, are only liable for fraud, or for such gross negligence as amounts to fraud, it remains but to apply this principle to the facts of this case."

But the case principally relied upon by the defendants is the recent one of *Movius* v. *Lee, 30 Fed. Rep. 298,* before District Judge Wheeler, of Vermont, sitting in the second federal circuit, and on appeal, *sub nom. Briggs* v. *Spaulding, 141 U. S. 132* (a case reviewed and criticised by Mr. Justice Ewing in *Swentzel* v. *Penn Bank*). There certain directors of an insolvent bank organized under the Federal Banking law were sought to be held liable because they failed to properly supervise the conduct of the vice-president in making loans, whereby the bank was wrecked.

It appears that the bill admitted that the bank was wholly solvent, having met no material loss, on October 3d, 1881, and failed on the 10th of the next April, the inroad on its funds having been made, according to the theory of the bill, in the short period of six months. One of the five directors sought to be charged sold his stock and resigned before October 3d, 1881; another left the country on leave of absence on account of ill-health, and was absent during the critical period; another was unable to attend by reason of illness and died December 11th, 1881. Two others were first elected on January 10th, 1882, just three months before the failure of the bank. One of these two was prevented by illness from attending to his duties as as director, and the other had substantially retired from business, having accepted the office with the understanding that he was not to give it his personal attention. No examination of the affairs of the bank was made by the directors or any committee thereof during the period in question. The money was in fact abstracted by the vice-president, who was a director. The bill was dismissed by Mr. Justice Wheeler, as to the five directors above mentioned, mainly, as I read his opinion, on the ground that the directors sought to be charged were not liable for the misconduct of their co-directors, on the notion that they were joint tort-feasors. I am unable to adopt this ground as

solid. It leaves out of view entirely the element of care and diligence in supervising the affairs of the bank, and it seems to have been entirely overlooked when the case came before the supreme court of the United States on appeal. There the majority, in affirming the decree, seem to have gone on the ground that although the bill alleged that the losses occurred after October 3d, 1881, yet in fact part at least occurred before that date, and certainly before January 10th, 1882; that the older directors were excused for non-action by reason of illness, and it did not appear that an actual interference by those directors who were elected in January, 1882, would have saved anything to the bank, hence no loss resulted from their negligence. It may be said, however, that in order, as it seems to me, to prevent the case from becoming a precedent, the learned chief-justice, who read the opinion of the majority, lays down at the end of his opinion a rule which approaches, if it does not quite reach, the proper standard of negligence in such cases. Four justices agree with the chief-justice. Four other justices dissented and declared in favor of holding the defendants in question liable for such losses as occurred after they had opportunity to investigate the affairs of the bank and stop the improper practices of the vice-president. I confess that I think the reasoning of the minority opinion more convincing. I shall not review either opinion at length. It is enough to say that, in my judgment, the reasoning of the majority opinion does not reach the present case.

A later federal case cited by the complainant is *Warner* v. *Penoyer, 82 Fed. Rep. 181 (Circuit Court)*, and *S. C., 91 Fed. Rep. 587*, on appeal, before Justices Wallace, Lacombe and Shipman. It was a bill by a receiver of a national bank against certain directors to recover for losses resulting, as alleged, from their negligence. The immediate cause of the loss was improper loans made by the cashier, without the authority of the directors, to a corporation in which he was a stockholder and of which he was an officer. This was accomplished by discounting worthless paper, in various shapes, and in excess of the ten per cent. limit of the National Banking law, and also by allowing large overdrafts. The directors, in pursuance of the custom in such cases,

appointed a discount committee and an examining committee. The resolution authorized the former committee to meet once a month to examine all discounted paper. Neither committee met oftener than twice a year, and then only in connection with the whole board of directors to declare dividends. There was no examination of resources and liabilities, or of the discounted paper, at any other time, and then the examination of the assets by the examining committee was so carelessly done that improper discounts and overdrafts escaped detection. The circuit court felt constrained, by *Briggs* v. *Spaulding,* to decree the defendants not liable; but the circuit court of appeals, in an opinion by Mr. Justice Wallace, held the members of the two committees liable. It appeared that each committee had reported to the full board upon the subject within their several provinces, and that the other directors had no reason to suspect that they had improperly or negligently performed their duty. The opinion recognizes the resort to committees to investigate and supervise as a legitimate mode of looking after the interests of the stockholders and creditors, and as relieving the other members of the board from liability where such appointment is made and the committee appears to have done its duty.

A few other extra-territorial cases cited by complainant's counsel may be properly noticed here.

*Marshall* v. *Farmers' and Mechanics' Savings Bank, 85 Va. 676 (Court of Appeals of Virginia).* The headnote by the West Publishing Company's editor is as follows:

"The president of a savings bank misappropriated its funds and overdrew his accounts, and a brother of the president, and corporations of which the officers and directors were also officers, largely overdrew their accounts, and were loaned large sums by the bank, with little or no security, though such borrowers were irresponsible, and another borrower was permitted to withdraw his security. The directors, though required to meet weekly, met but once, twice or three times a year, and never caused the books to be examined, nor called for statements of accounts with other banks. The capital of the bank was small, and much of it was not paid up, and' the paid-up portion was treated as a loan. The bank, on suspension, was able to pay but ten per cent. on the deposits.— *Held,* that though the directors were ignorant of the affairs of the bank and were not guilty of bad faith, they were guilty of such negligence as rendered them liable to the depositors."

The facts were: The suit was brought by the complainant, on behalf of himself and other creditors, to wind up the affairs of the bank and to charge the individual defendants, officers and directors, with the difference between the assets and liabilities of the bank, upon the ground that the directors had not had a meeting for at least one year prior to the 1st of December, 1876, the date of the bank's suspension, and for at least one year prior to the ascertainment of its embarrassed condition, which occurred some time before its suspension, and that they did not give that care, supervision and attention to the business affairs of the corporation which the duties of the office and the nature of the trust reposed in them required; but, on the contrary, neglected the same, and intrusted the business concerns of the bank entirely to the president and one, and possibly two, directors, who recklessly and improvidently loaned the money and securities of the corporation to various embarrassed and insolvent corporations, firms and individuals, without taking proper and sufficient security for the protection of the depositors and creditors of the bank, and being themselves connected with, or interested in, such embarrassed and insolvent corporations, by reason of which conduct upon the part of the directors the appellant claimed that heavy losses had fallen on the bank, and that the directors were individually and personally liable to the depositors and creditors of the bank for the losses so occasioned.

The directors answered individually, denying the negligence, but it was admitted that

"instead of regular formal weekly meetings of the board, as prescribed by the by-laws of the bank, informal meetings were substituted, it being proved soon after the bank went into operation that formal weekly meetings were unnecessary."

The prevailing opinion is long, well reasoned and exhaustive, and is worth careful perusal. I quote a few passages which seem to me apt for present purposes:

"They were required simply to show a reasonable capacity for the position they accept; to use in it their best discretion and industry; to show scrupulous *bona fides* and conscientiousness in every matter, however minute, which is exacted rigorously from

all trustees of the property of others, and to obey accurately the requisitions of the charter, or of the general law, under which they are organized. * * * But ignorance of any fact in the bank's affairs which it is their duty to know can never be set up by them in defence or exculpation for any act which the existence of that fact should have prohibited. * * * The directors of a bank are not trustees for the stockholders alone, but they owe an even earlier duty to the depositors.".

Quoting from Mr. Morawetz, the judge says, in reference to the application of the doctrine of gross negligence and ordinary negligence: "But all this is, at the best, misleading. *The plain and obvious rule is that directors impliedly undertake to use as much diligence and care as the proper performance of their office requires.*"

Again: "Directors can never set up as a defence that they were ignorant of a provision of the company's charter or by-laws. But the co-directors seek to escape responsibility for all this, including the large loss by the Washington and Ohio railroad, by claiming to have no actual knowledge of it at all. Did they exercise ordinary diligence to inform themselves, as their duty certainly required that they should? They were required to meet weekly by their own by-laws. They did not always meet semi-annually—meeting sometimes once a year, as we have stated. They were in duty bound to cause the books of the bank to be examined at regular intervals. This they never did at all throughout their whole career, nor did they ever call for a statement of their accounts with other banks. Their vaults and their cash-drawer were emptied by illegal abstractions and insolvent loans, and they admit that they never knew it, and pleaded this as their exculpation."

Another case, by an individual judge, is *Houston* v. *Thornton, 122 N. C. 365.* In that case I find the following remark of the judge, in which I concur: "It is the duty of directors to know the condition of their bank and to prevent publication of false statements of its condition, and by no private arrangement could they be excused from giving proper attention to such duties because they are non-residents of the town wherein their bank is located."

Campbell, Receiver, *v.* Watson.

Another valuable opinion is that found in *Warren v. Robison, 19 Utah 289,* decided in 1899 by the supreme court of Utah. The headnote is as follows:

"The board of directors of a banking corporation is elected primarily for the management of the corporate affairs; and when the board delegates its authority to the executive officers, and through their carelessness and mismanagement disaster and loss to the stockholders and creditors ensue, the individual members of the board cannot escape liability by showing that they did not know of the unfortunate transactions, and were ignorant of the business of the corporation. Directors of a banking corporation are bound to use ordinary care and prudence, and to exercise over the affairs of the bank such supervision and vigilance as a discreet person would exercise over his own affairs."

I quote as follows from the opinion of the chief-justice:

"If it had been the intention of the legislature that the officers provided for should have full control, without supervision, of the business transactions and affairs of a bank, then it would have been a useless thing to provide for a board of directors, for the stockholders could elect such officers as easily as they could the board. The legislature had in view no such purpose. *The directors were not intended to be mere figure-heads without duty or responsibility.* The manifest design of the lawmakers was that the officers, elected by the board, were to look after and attend to the details of business and generally to conduct ordinary business matters. They are the means with which the directors are to administer the affairs of the bank. It is therefore the right and duty of the directors to take upon themselves the management of the institution, and to exercise and maintain a supervision over all business operations, upon the skillful and wise conduct of which depend the prosperity of the institution and the safety of those dealing with it. * * * The duties of directors are administrative, relate to supervision and direction, and when it is sought to hold them responsible for a dereliction of duty, because of which a loss occurred to stockholders and creditors, *they cannot evade liability by pleading ignorance of the affairs of the institution, incompetency, or gratuitous service, or that the management of the banking business was in the hands of the cashier or other executive officer.* Where there is a duty

of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. While the directors of a corporation may and must, as already stated, commit the details of its business to inferior officers, this does not absolve them from the duty of maintaining a reasonable supervision, and, if such inferior officers waste the assets of the corporation, it is conceded that the directors cannot escape liability on the ground that they did not know of the wrongdoing, provided that it appear that their ignorance was the result of a want of that care which ordinarily prudent and diligent men would exercise under similar circumstances. * * * Evidently persons who, as directors, assume control of a banking institution must exercise such a degree of care, skill and diligence as is required by the situation and nature of the business. By taking such positions, although without compensation, directors invite confidence that they possess at least ordinary knowledge and skill, and that they will do all that men of reasonable prudence and caution ought to do to protect the interests of stockholders and depositors, or those dealing with the institution. The public, therefore, have a right to suppose that they are men of high character for integrity, of reasonably sound judgment, and of such good business sense as is necessary to conduct the affairs of the bank wisely and with reasonable safety. Acting upon this supposition, the public trust their deposits with the bank in the confidence that the important duty of management and direction will be discharged by the directors. * * * The rule most in harmony with the character and well-being of such an institution appears to be that the directors, in administering its affairs, must exercise ordinary care, skill and diligence. Under this rule, it is necessary for them to give the business under their care such attention as an ordinarily discreet business man would give to his own concerns under similar circumstances, and it is therefore incumbent upon them to devote so much of their time to their trust as is necessary to familiarize them with the business of the institution, and to supervise and direct its operations. That the board of directors can leave the management of the banking business to the executive officers, and then when, through carelessness and mismanagement, disaster to the stockholders and creditors ensues, avoid

liability, on the ground that they did not know of the unfortunate transactions, is a notion which must be repudiated.  *  *  * Some of the directors, as is indicated by their statements on the witness-stand, seem to have acted upon the theory that, by the appointment of executive officers in whom they had confidence and who were reputed honest, they discharged their duties as directors, and that the burdens and responsibilities of management and supervision were then shifted to such officers. As we have seen, such is not the law. *The directors were not mere ornaments to the bank to lure public confidence.* When they became directors the law cast upon them the important duties of supervision and direction, which they could not delegate to the excutive officers, and therefore the stockholders and depositors had the right to intrust the institution with their money, in confidence that the directors would perform those duties. When sued for losses which resulted from careless or unlawful acts and unfortunate transactions, they can never set up as a defence that they did not examine the books or accounts of the bank, knew nothing about the loans or discounts, were ignorant of banking business, or that they intrusted the management and supervision of the business to the executive officers, in whom they had confidence. The welfare of the public and the interests of banking institutions alike forbid this."

Coming to our own state, it is only necessary to cite the well-known cases of *Williams* v. *McKay* and *Wilkinson* v. *Dodd.* In *Williams* v. *McKay, 13 Stew. Eq. 189,* Chief-Justice Beasley, speaking for the court of errors and appeals (where the case was considered on appeal from an order sustaining a demurrer), uses this language (at *p. 195*) : "Viewed in its general aspect, the equitable rule which is applicable to persons holding official positions such as were held by these defendants is not in doubt. The duty belonging to such a situation is a plain one—to care for the moneys intrusted to them in the manner provided in the charter, and to exercise ordinary care and prudence in so doing. It is true that the defendants were unpaid servants, but the duty of bringing to their office ordinary skill and vigilance was none the less on that account, for to this extent there is no distinction known to the law between a volunteer and a salaried agent.

These defendants held themselves out to the public as the managers of this bank, and by so doing they severally engaged to carry it on in the same way that men of common prudence and skill conduct a similar business for themselves. This is the measure of the responsibility of officers of this kind." And again (at *p. 196*) : "Doubtless such officers had the right to rely, in many respects, on the skill and diligence of their committeemen, and if, exercising a reasonable circumspection, they were unaware of the misconduct or neglects of such agents, they would not be responsible for the consequences. But so plain was their duty to oversee the business done by such committeemen that, it seems to me, they are chargeable, *prima facie,* with a knowledge of what was doing, or had been done, in all important matters by such bodies. That they themselves thought this duty of general supervision was incumbent upon them is perfectly manifest from the entire tenor of the by-law prescribing the conduct of business at the semi-annual meetings, and providing that at such times should be read the reports of the treasurer and committees and of the minutes of the finance committee. From these considerations I think it might be conceded that these officers had no special dispensation from the exercise of that degree of care and vigilance that the law generally exacts of persons holding similar positions. * * * It is a mistake, sure to mislead, to regard this suit as one solely in right of the insolvent corporation. It does not rest upon that narrow footing, for the receiver represents, not only the corporate body, but likewise the depositors and creditors; and the question which presents itself, therefore, is as to the *status* of the managers with reference to the latter two classes of persons; and as to them, I entertain no doubt whatever that these officers must respond to them in the character of their trustees." And again (at *p. 201*) : "These illegal loans ran through a long period of years, and represented large sums of money; and it is perfectly obvious that it was the settled practice, in this business, to make them in this form, and it is, consequently, an inference absolutely necessary, from the facts as presented, that the managers, as a body, knew of such practice. If, during the long continuance of this practice, these officers never discovered its existence, or knew that their president, from

time to time, drew out of the bank, on his own checks and notes, these large sums of money, it seems to me that, *prima facie,* such want of knowledge would be, of itself, and until explained, very clear proof of gross negligence on their part. It does not seem to me that it was possible that these officials, if they faithfully discharged the functions of their office, could have failed to become acquainted with these transactions, and I have no idea that it is the business of this court to draw improbable deductions from the statements of this bill, in order to shield these defendants from answering it. And I entirely repudiate the notion that this board of managers could leave the entire affairs of this bank to certain committeemen, and then, when disaster to the innocent and helpless *cestuis que trustent* ensued, stifle all complaints of their neglects by saying, we did not do these things, and we know nothing about them."

The case came on afterwards for final hearing before Chancellor McGill. His opinion is reported in *1 Dick. Ch. Rep. 25.* The directors were held liable. The headnotes applicable here are the following:

"The managers of a savings bank, without capital, and incorporated for the express purpose of receiving deposits of moneys and executing trusts, using and improving such deposits in a prescribed manner and dividing the net income and profits among the depositors and repaying the deposits, are bound to invest the bank's money, not only according to the requirements of the charter of the bank, but also with a prudence commensurate with the character and objects of the institution.

"In discharge of their obligations, such managers are authorized to define the duties of the officers of the bank, and in order to facilitate the transaction of business, appoint small committees from their number to superintend those officers and dispose of detail and routine work, but they are, at the same time, bound to a reasonable supervision of such officers and committees, and to knowledge of their business methods.

"In a suit by the receiver of such a bank against its managers, where a loss is shown to have resulted from dishonesty, disregard of the charter's requirements or culpable negligence, all the managers who are chargeable with such faults must be held alike responsible, so far as the receiver is concerned, without reference to the degree of their dereliction, but, as between themselves, there may be grades of liability according to the degrees of culpability.

"Such grades may be as follows: *First,* those managers who were concerned in, and who profited by an unlawful, imprudent or negligent transaction that resulted in loss; *second,* those who, though concerned in such a transaction, did not profit by it; *third, those who, though they did*

*not know of the transaction which occasioned the loss, by the negligent and improper discharge of some duty which was specially imposed upon them, made such loss possible; fourth, those who, though they did not know of the transaction which occasioned the loss, negligently omitted to perform a duty specially charged upon them, the proper performance of which would have prevented the loss;* and the *fifth*, those who, though not charged by the by-laws with any special duty, failed to exercise that reasonable circumspection over the affairs of the bank which the law demands of them.

"A savings bank manager, in the discharge of his duties, is bound to possess ordinary competency, and cannot excuse misconduct by pleading gross ignorance.

"Managers of a savings bank will be held to a knowledge of the provisions of its charter, unless they make it appear affirmatively that they have excusably mistaken the meaning of those provisions.

"An excusable mistake in the meaning of a law is one which occurs after all means of information that suggest themselves to a man of ordinary care and prudence have been exhausted."

At *p. 36* he says: "It cannot be questioned that, in pursuance of their duty, it was proper for the managers to define the duty of the officers of the bank, and, to facilitate the transaction of business, appoint small committees from their number to superintend those officers and dispose of detail and routine work that could not readily be disposed of by the more numerous and unwieldy board of managers, for it would be almost impracticable for the managers, in a body, to attend to such matters. But it does not follow, because of the appointment of such officers and committees, that the managers, who were not charged with official duty, might relax vigilance and rely entirely upon officers and committees. A man of common prudence and skill, in managing a similar business for himself, would not be guilty of such unguarded confidence. He would, from time to time, acquaint himself with the manner in which such delegates were performing their duties and with the practices which prevailed in the conduct of the business, so that he might determine whether the business methods were safe and proper. He might not look so closely into the affairs of the business as to detect concealed and isolated instances of wrongdoing, but he would so familiarize himself with their workings that he would readily detect habitual looseness, carelessness and wrongdoing."

And again (at *pp. 38, 39*): "As will be hereafter seen, the facilities thus afforded by the treasurer's dereliction of plain duty

resulted in the bank's ultimate ruin. A simple inspection of the check-book at any time by any of the managers would have revealed checks signed in blank and numerous unfilled stubs, and, I think, would have led any reasonably careful man to an inquiry which would have disclosed the dangerous and intolerable condition of the bank's affairs.

"The by-laws made it the special duty of the executive committee to take general charge of the bank and its books and securities, and I find no sufficient excuse, at any time, for its non-performance of that duty.

"If this committee had performed its duty in this particular with ordinary care, the president's methods, and the treasurer's culpable infraction of ordinary business rules and precautions, would unquestionably have come to light.

"Not only did this committee entirely neglect to examine the bank books, but its examination of the securities was a mere perfunctory performance of that duty. It was, habitually, a mere comparison of a bundle of papers with a list of the securities supposed to be owned by the bank. Both the bundle and list were produced by the secretary. The examination consisted in checking the papers on the list as they were called off. No inquiry appears to have been made as to the character or value of the security. It was not noticed that there were bonds and mortgages among the papers that had been purchased by the bank but had been taken in the names of individuals who had not assigned them to the bank, and mortgages to which the bank had no title, and even fictitious mortgages put among the papers to account for missing moneys. The slightest excuse by the president seems to have satisfactorily accounted for the non-production of valuable negotiable securities, the names of which appeared upon the list.

"The finance committee appears to have exhibited a similar indifference to the duty imposed upon it. At each meeting of the board of managers the lists of the securities of the bank showed new investments upon which the committee had never acted, yet it failed to assert its right to pass upon the investments and to protest against the usurpation of its functions by

29

the officers of the bank. The atmosphere was one of apathetic disregard of personal obligation and abject submission to the will of the president of the bank. There does not seem to have been the least inquiry into the propriety, honesty or legality of his methods until after it was discovered that the bank had been ruined."

And again (at *p. 73*) : "The managers who were not upon committees were bound to a reasonable supervision of the committees. Chief-Justice Beasley says that that duty was so plain that they are chargeable *prima facie* with knowledge of all the important acts of the committees. If they were chargeable with knowledge of acts, by parity of reasoning they should also be chargeable with knowledge of omissions or non-performance of duty.

"It is true they deny knowledge of the derelictions of their committeemen, but in face of proofs that clearly show that the bank was notoriously operated by Halliard and Hallaman, in utter disregard of the committees, this denial serves only to prove them to have been guilty of gross negligence.

"Their professions of confidence in Halliard will not protect them. The duty required of them was the care that an ordinarily prudent man exercises in a similar business of his own, not a blind, unsuspicious confidence in their president.

"The circumstances that that officer habitually disregarded and violated the charter and by-laws of the bank should have been sufficient to have destroyed such a confidence.

"Had these committeemen and managers performed their duties with ordinary care, I am satisfied that these withdrawals might have been prevented."

These principles were applied in the other case arising out of the failure of the Newark Savings Institution, as reported in *Wilkinson* v. *Dodd, 13 Stew. Eq. 123; S. C., 14 Stew. Eq. 566; S. C., 15 Stew. Eq. 234, 647;* and see *1 Morawetz Corp. (2d ed.)* §§ *551, 552.*

The result of this examination of the authorities leads to the conclusion that all these defendants are liable for the losses so far under consideration; for the youngest director in point of time of election—Dr. Wilson—came into the board in January,

1892, which is the date of the election of Valentine as cashier; subject, however, to what may be said as to the individual defences interposed by each.

Before considering those I will refer to one or two other items or, rather, classes of loss sought to be charged against the defendants.

The bill and proofs show that Valentine habitually overdrew his account, and was not prohibited from so doing; that the amount of the overdraft increased from time to time until it assumed large dimensions; in December, 1897, $37,000; January, 1898, $10,000; November, 1898, $15,000, and December, 1898, $19,000; that from time to time loans were made to him on insufficient security to make good his overdrawn account; that at one time a discount was made of the cashier's notes endorsed by his father (who was also surety on the cashier's bond) to the amount of $23,000; that two notes of George M. Valentine & Co. (a co-partnership of which the cashier was a member) for $4,500, endorsed by George M. Valentine, was credited to him, and demand loans without security made to him directly to the extent of $43,700, all placed to his credit. Robert N. Valentine, the father, proved to be insolvent after paying the amount of the son's bond as cashier. So that the total loss on this head was over seventy-seven thousand dollars. The fact of these overdrafts, and the bad character of the loans made to Valentine to make them good was early called to the attention of the president and directors by the state banking examiner, with the result that the overdrafts were made good by more bad loans. I am decidedly of the opinion that it was the duty of the directors, under the circumstances of this case, to look into the accounts of the cashier and ascertain the character of his individual financial dealings with the bank. They certainly had actual knowledge of facts enough of a character to put them on inquiry, without resorting to any general rule of duty on their part to inquire as to the condition of the individual account of each officer of the bank. The loans made to the cashier to make these overdrafts good were not made in the ordinary course of business and under circumstances which enabled the directors to shield themselves behind the rule that in making them they

were acting within the sphere of judgment, and that they should not be held responsible for mere mistakes of judgment. The primary mistake which led to the taking of the bad paper was the permitting the cashier to overdraw as he did, and, when discovered, the mistake was continued in retaining him in the employ of the bank.

The bill further charges losses by reason of the abstraction from the bank of moneys, by reason of receiving payment of promissory notes by the cashier, without making any entry on the books of the bank, whereby the ledger account of bills discounted amounted, at the failure, to several thousand dollars more than the total footing of a list of the notes actually found amounted to. I have not gone carefully into that part of the case, because it is a mode of theft, when confined to a small amount, not so easily discovered by a comparison of the books with the bills discounted actually on hand, and, in fact, more easily concealed. And, moreover, the amount with which I have felt constrained already to charge the directors is so large that, according to statements of counsel, there is no probability that they will be able to pay it.

Another item was the probable loss by the bank of large sums of money by two bad loans—one known as the Ramsay loan and the other known as the Chapman loan. At my suggestion those claims were not pressed at the final argument. It is proper, however, to say of both that the making of them indicated bad judgment on the part of the directors.

Coming now to the individual answers, it is quite impossible to see any escape for the president, Uriah B. Watson. He was not only a director, but he was president of the bank and its principal executive officer, and it was especially his duty to examine into all the matters and things which have been heretofore referred to, namely, the checking off of the accounts and the overdrafts.

The defence of Robert N. Valentine, set up in his answer (he did not appear), is principally that of ignorance, and

"that he had no knowledge or suspicion that the accounts were incorrect in any particular; but relied upon the statements made by the officers and an examination made from time to time by the state officials."

Further, that he did not consider it his duty as a director to make comparisons, from time to time, of the accounts, and that he knows nothing of the discrepancies in the Park Bank account. He did not know of the overdrafts of his son, and that loans were made to secure those overdrafts.

Kearny and Convery answer together. They admit the knowledge of the by-law requiring the appointment of a committee for the examination of the affairs of the bank, but that they thought it was unnecessary after the commencement of periodical examinations by the state banking department. On the stand they denied that they knew anything about the by-law, but they are not only contradicted by their own answer in this respect, but the minutes of the bank, as I have already shown, show that they had full knowledge of it. They put themselves upon the confidence they had in the cashier, and upon the fact that it was the duty of the president to take the direction and general oversight of the business.

Pierce and Wilson join in an answer, in which they rely upon general ignorance of the matters and things charged against them and of the affairs of the bank, or that it was their duty to take any further part in the management of the bank than they did.

The defendant James T. Watson, by his answer, alleges that, on several occasions, he was appointed on committees to examine into the affairs of the bank, and actually made reports. But in this he is not supported by evidence, except that heretofore referred to, found on the minutes of the board of directors. The rest of his answer is mainly denial of any knowledge of the facts set forth in the bill.

For the reasons already stated, at too much length, I am unable to find any of the defendants blameless, and will advise a decree against all for the several sums above mentioned.